SECOND DIVISION

No. 1-06-2866

| | |
|---|---|
| In re MARRIAGE OF | ) Appeal from the |
| SUSAN LYNN BAUMGARTNER, | ) Circuit Court of |
| | ) |
| Petitioner-Appellant, | ) Cook County. |
| | ) |
| and | ) No.  1997 D 019363 |
| | ) |
| CRAIG BAUMGARTNER, | ) Honorable |
| | ) Grace G. Dickler, |
| Respondent-Appellee. | ) Judge Presiding. |

JUSTICE HALL delivered the opinion of the court:

The petitioner, Susan Lynn Baumgartner, now known as Susan Lynn Ginensky (Susan), filed a petition seeking to hold her former husband, respondent Craig Baumgartner (Craig), in indirect civil contempt for failure to comply with an order for child support. The circuit court of Cook County ordered Craig to pay additional amounts of child support but refused to enter a contempt finding and sanctioned Susan for a discovery violation.

Susan appeals, raising the following issues: (1) whether the parties' settlement of Craig's 2001 child support obligation was enforceable; (2) whether the proceeds from mortgage loans and the proceeds from the sale of residential property are income for determining child support; (3) whether Craig's nonreimbursed business expenses are deductible in determining his net income for child support purposes; (4) whether the circuit court erred in requiring Susan to prove that Craig's unexplained bank deposits were income for child support purposes; (5) whether the circuit court erred when it refused to hold Craig in indirect civil contempt of court; and (6) whether Susan's conduct in

subpoenaing Craig's attorneys for deposition was sanctionable.

## Procedural History

The parties' marriage was dissolved in 1998. Pursuant to the judgment for dissolution of marriage, the parties had joint custody of their only child, Maxwell Taylor Baumgartner (Max). However, Max was to reside with Craig.

On April 19, 2001, an agreed order was entered modifying the judgment for dissolution of marriage (the agreed order). The agreed order provided that Max was to reside with Susan and set forth Craig's child support obligation as follows:

"Effective January 1, 2001 Craig shall pay $762 per month to Susan as child support which is 20% of his estimated net income. At this time, it is not known whether Craig's monthly net income will exceed $3,809 due to overtime, bonuses, or raises. Accordingly, on an annual basis, within 30 days after Craig receives his W-2 statement from his employer at year end, he will: (i) provide a copy of his W-2 to Susan along with a copy of his Year-end pay stub, and (ii) recompute his net income in light of any additional income and/or deductions in excess of the amount upon which this order is based; and (iii) if the amount of child support paid during the prior year was less than 20% of Craig's actual net income from,[1] he will pay Susan the

---

[1]There appears to be missing text in the order.

2

difference between the amount paid and the recomputed 20% figure so that the total amount will equal 20% of Craig's net income, as defined by 750 ILCS 5/505.  In addition, Craig will provide Susan with copies of his income tax returns on an annual basis within 14 days after filing the returns."

On June 3, 2005, Susan filed a petition seeking to have Craig held in indirect civil contempt for failure to comply with the agreed order.  Susan alleged that Craig had paid only the minimum child support amount for the years 2001 through 2004, and had refused to pay the excess amounts due under the re-computation formula in the agreed order.  Susan further alleged that Craig had failed to provide her with proof of his income as required by the agreed order.  Susan sought attorney fees and costs.

On June 29, 2005, pursuant to section 2-619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-619 (West 2004)) Craig filed a motion to strike and dismiss the allegations relating to the claimed arrearage for 2001.  Relying on the doctrine of equitable estoppel, Craig alleged that Susan and he had entered into a settlement agreement resolving the amount of child support due for 2001.  Attached to the motion was a copy of a letter from Susan's attorney to Craig's attorney containing the terms of the settlement agreement, a facsimile confirmation from Craig's attorney accepting the settlement offer and a copy of the Craig's

cancelled check demonstrating payment of the settlement amount.

In her response to the motion, Susan argued that extrajudicial modifications of support obligations were not enforceable. She further argued that Craig could not rely on equitable estoppel because he had not relied to his detriment on the agreement and that there was no consideration for the settlement agreement. On August 17, 2005, the circuit court granted Craig's motion to dismiss the claim for child support for 2001 and set the case for trial on the remaining allegations of the petition.

On October 6, 2005, Craig filed a motion for partial summary judgment on Susan's claims that 20% of the proceeds of a residential mortgage loan Craig obtained and 20% of the proceeds from the sale of Craig's homestead property should have been paid to her as child support for Max.[2] Susan responded that summary judgment was not appropriate as there existed questions of fact as to what happened to the proceeds from the sale of his residence. She further argued that there was no authority under section 505 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/505 (West 2004)) to exclude proceeds from residential property transactions or loan proceeds from

---

[2]The homestead property referred to was a residence Craig acquired when he lived in California, sometime after the dissolution of the parties' marriage.

income for purposes of determining child support. Following a hearing, the circuit court granted the motion for partial summary judgment.

On December 21, 2005, Susan's attorney issued a subpoena for deposition to Craig's wife, Jeanine Baumgartner. Susan's attorney also issued subpoenas for deposition and document production to Craig's attorneys, Julie Campbell and Robert Ramirez, Jr.

On December 29, 2005, Craig filed a motion to quash the deposition subpoenas and for sanctions. In his motion, Craig alleged that the subpoenas issued to his attorneys sought discovery of material protected by the attorney-client privilege and were issued to harass, annoy and disqualify the attorneys from representing him. Craig sought sanctions pursuant to Supreme Court Rule 137 (155 Ill. 2d R. 137) and Supreme Court Rule 219(d) (210 Ill. 2d R 219(d)).

On January 18, 2006, Susan filed her response to the motion to quash. Susan maintained that the subpoena for deposition to Ms. Campbell was based on Ms. Campbell's association with Craig's consulting business and not their attorney-client relationship. Susan further maintained that Craig had waived the attorney-client privilege with respect to Mr. Ramirez when he asserted the affirmative defense that he relied on Mr. Ramirez's advice in this case. On January 24, 2006, the circuit court entered an order denying the motion to quash as to Jeanine Baumgartner but

5

granting the motion as to Ms. Campbell and Mr. Ramirez.

On January 26, 2006, a hearing was held on Susan's petition to hold Craig in contempt. Susan's attorney questioned Craig about deposits made to joint accounts. After Craig answered numerous times that he did not recall the source of the deposit, his attorney objected on relevancy grounds. The circuit court sustained the relevancy objection on the grounds that there was no proof that the deposits were Craig's or that the deposits were from income over and above what he had already disclosed as income. Under questioning by his own attorney, Craig explained that in 2002, some of the deposits could have come from his NeoPharm paychecks. He further explained that the deposits could have been made by his present wife, Jeanine, from her income or accounts.

On direct examination by his attorney, Craig testified as to business expenses he had used to arrive at his net income to determine his child support obligation. Susan's attorney stipulated to the evidence of the deductions but not to the propriety of the deductions. The case was continued for decision.

Prior to the court's ruling on the petition, Craig offered the sum of $2,554.48 to Susan to settle the 2005 child support amount, in exchange for a complete release of his 2005 child support obligation. On March 6, 2006, Susan filed a petition for indirect contempt of court against Craig for his failure to pay

6

the child support he owed for 2005.

On March 14, 2006, the circuit court entered its order as to the petition for indirect civil contempt for the years 2002, 2003 and 2004. The court ruled as follows: (1) Craig's failure to pay the balance of child support due for those years was not contemptuous; (2) Craig was permitted to deduct his business expenses, medicare tax, social security payments, actual federal, state and local taxes paid and his health insurance premiums from his gross income to determine his net income for child support purposes; (3) Craig owed $1,664.95 for 2002, $5,035.42 for 2003 and $4,500 for 2004 child support; (4) no interest was due for those amounts pursuant to section 505 of the Act (750 ILCS 5/505 (West 2006)); and (5) Susan's request for attorney fees was denied but leave was granted to the parties to file for contribution. Craig was ordered to pay the above sums to Susan; his petition for sanctions remained pending.

The court also ruled on Susan's petition on Craig's 2005 child support obligation. The court found that Craig's failure to pay the balance due for 2005 was not contemptuous, and he was permitted to take the aforementioned deductions from his gross income to arrive at his net income for child support. The court calculated the balance of his support obligation for 2005 to be $3,526.06. The court denied Susan attorney fees but again granted leave to file for contribution.

On June 8, 2006, the circuit court heard argument on Craig's

No. 1-06-2866

motion for sanctions.  The court denied Rule 137 and Rule 219(d)
sanctions but awarded sanctions for the issuance of the subpoenas
to Craig's attorneys, stating as follows:

> "But I really feel that issuing those subpoenas to
> opposing counsel went beyond what was appropriate in this
> case.  It went beyond advocacy, I believe.  I believe that
> it was for the purpose of either causing a disqualification
> of attorneys or for the purpose of harassment of those
> attorneys, and that I cannot countenance."[3]

On September 8, 2006, the circuit court ordered Susan to pay
$7,579.50 in attorney fees to Craig.  On September 25, 2006,
Susan filed her notice of appeal.

ANALYSIS

I.  Dismissal of Claim for 2001 Child Support

A.  Standard of Review

The circuit court granted Craig's section 2-619 motion and
dismissed Susan's claim for unpaid child support for the year
2001.  The court reviews de novo an appeal from a section 2-619
dismissal.  In re Marriage of Morreale, 351 Ill. App. 3d 238,
240, 813 N.E.2d 313 (2004).

---

[3]According to the court's written order, sanctions were
denied as to Supreme Court Rule 213(b) (Official Reports Advance
Sheet No. 26 (December 20, 2006), Rule 213(b), eff. January 1,
2007) but granted as to Rule 219(d).

8

## B. Discussion

### 1. Enforceability of 2001 Judgment Modification Order

Both parties submit that the agreed order violates the Act, albeit for different reasons. Susan contends that the circuit court erred in entering the agreed order because the order allowed Craig, rather than the court, to determine the amount of child support he was to pay. Craig contends that the agreed order violates section 505(a)(5) of the Act because the circuit court was able to express the child support amount in a dollar figure. We disagree with the parties.

Prior to the entry of the agreed order in this case, section 505(a)(5) required that the support amount be stated in dollar amounts. 750 ILCS 5/505(a)(5) (West 1998). In In re Marriage of Mitchell, 181 Ill. 2d 169, 682 N.E.2d 281 (1998), the supreme court held that a child support order stated as a percentage rather than a dollar amount was not permitted under section 505(a)(5). However, the court concluded that the order was voidable, not void, as the circuit court had jurisdiction of the parties and the subject matter though its decision was erroneous. As a voidable order, it was not subject to collateral attack. The parties had not appealed from the support order but were before the court on a petition for modification. Noting that the parties had the opportunity to fully litigate the question when the support order was entered as well as the opportunity to bargain for and benefit from the terms of the settlement

9

No. 1-06-2866

agreement, the court concluded that the trial court's order was not subject to a collateral attack. <u>Mitchell</u>, 181 Ill. 2d at 177.

In the present case, both Susan and Craig agreed to the entry of the modification order; neither party appealed the agreed order. Therefore, the order may not now be attacked collaterally by the parties.

Moreover, subsequent to <u>Mitchell</u>, the legislature amended section 505 (a)(5), which now provides as follows:

"If the net income cannot be determined because of default or any other reason, the court shall order support in an amount considered reasonable in the particular case. The final order in all cases shall state the support level in dollar amounts. However, if the court finds that the child support amount cannot be expressed exclusively as a dollar amount because all or a portion of the payor's net income is uncertain as to source, time of payment, or amount, the court may order a percentage amount of support in addition to a specific dollar amount and enter such other orders as may be necessary to determine and enforce, on a timely basis, the applicable support ordered." 750 ILCS 5/505(a)(5) (West 2000).

In this case, the agreed order stated that "Craig's net monthly income *** will be approximately $3,809." The agreed order provided further in pertinent part as follows:

10

"Effective January 1, 2001, Craig shall pay $762 per month to Susan as child support which is 20% of his estimated net income.  At this time it is not known whether Craig's monthly net income will exceed $3,809 due to overtime, bonuses, or raises."

The above language indicates that there was some uncertainty about the exact amount of Craig's monthly income from which to determine his child support obligation.  As a result and with the parties' agreement, the circuit court modified the support order to provide a specific dollar amount of support based on the known figure and further provided that Craig would pay 20% of any additional income not accounted for by the stated dollar amount.  Under section 505(a)(5), the court had the authority to enter the order providing for a percentage of Craig's income as child support.

The cases Susan relies on do not support her position that the agreed order is unenforceable.  Contrary to Susan's argument, in In re Marriage of Blaisdell, 142 Ill. App. 3d 1034, 492 N.E.2d 622 (1986), the court held that the "[d]etermination of child support involves no inherent judicial powers."  Blaisdell, 142 Ill. App. 3d at 1043.  In In re Marriage of Takata, 304 Ill. App. 3d 85, 709 N.E.2d 715 (1999), the court did state that determining a spouse's net income for setting child support is part of the judicial function.  Takata, 304 Ill. App. 3d at 92.  However, the issue in Takata was whether a mathematical error in

11

a judge's calculation of net income could be corrected via a <u>nunc</u> <u>pro</u> <u>tunc</u> order. Because it was not a clerical error but a judicial one, it was outside the power of a <u>nunc</u> <u>pro</u> <u>tunc</u> order. <u>Tataka</u>, 304 Ill. App. 3d at 93.

Susan cites <u>In re Marriage of Stribling</u>, 219 Ill. App. 3d 105, 579 N.E.2d 6 (1991) wherein the court stated, "'[c]ourts have no power to delegate any of their duties unless clearly authorized by law.'" <u>Stribling</u>, 219 Ill. App. 3d at 109, quoting <u>Smallwood v. Soutter</u>, 5 Ill. App. 2d 303, 309, 125 N.E.2d 679. Noting that the legislature had vested the responsibility of establishing and modifying visitation schedules in the courts, the court held that the trial court could not leave the determination of whether a father should have visitation with his daughter to the discretion of the Department of Children and Family Services. <u>Stribling</u>, 219 Ill. App. 3d at 109. In contrast, section 505(a)(5) grants the circuit court the authority to use percentages and to enter orders relating to the determination of child support.

We conclude that the agreed order was valid under the authority granted to the circuit court under section 505(a)(5) of the Act to enter the orders necessary to determine and enforce the child support ordered.

2. Enforceability of Parties' Private Agreement

Susan contends that the parties' agreement as to the 2001 child support obligation is unenforceable because only the court

12

has the authority to modify child support. "The modification of a child support obligation is a judicial function, administered exclusively by the court as a matter of discretion." Blisset v. Blisset, 123 Ill. 2d 161, 167, 526 N.E.2d 125 (1988). In Blisset, the supreme court held that in order to create an enforceable modification agreement, parents must petition the court and satisfy the court that their agreement is in the best interests of the child. Blisset, 123 Ill. 2d at 168. In Blisset, the court held an agreement to waive child support in exchange for a waiver of visitation rights was not enforceable because the parties did not seek court approval of their agreement. See Blisset, 123 Ill. 2d at 168; see also In re Marriage of Smith, 347 Ill. App. 3d 395, 400-01, 806 N.E.2d 727 (2004) (even if mother told the father that if he continued to purchase things for the children, he need not pay child support, such an "agreement" was not enforceable absent court approval).

In the present case, the agreed order contemplated that after Craig provided the required financial information, the parties would come to an agreement regarding the additional amount of child support that was due. Therefore, the parties were acting under the direction of the circuit court's order when they entered into an agreement as to the 2001 child support obligation and, as such, had the circuit court's approval to enter into such an agreement.

Moreover, we agree with the circuit court that the parties'

13

agreement was not a modification of the child support order. The August 19, 2002, letter from Susan's attorney to Craig's attorney refers to the settlement as a "support adjustment" in accordance with the agreed order. The agreement did not change Craig's obligation to pay 20% of his net income to Susan for child support. Therefore, unlike Blisset or Smith, the parties' agreement as to the additional support amount due for 2001 did not require court approval as it was not a modification of Craig's support obligation.

As the parties' agreement was not a modification of Craig's child support obligation, we need not reach Susan's alternative arguments.

## II. Loan Proceeds and Property Sale Proceeds

### A. Standard of Review

The de novo standard of review is applicable to a circuit court's grant of summary judgment. Prowell v. Loretto Hospital, 339 Ill. App. 3d 817, 822, 791 N.E.2d 1261 (2003). The court also applies de novo review to the construction of a statute. R&B Kapital Development, LLC v. North Shore Community Bank & Trust Co., 358 Ill. App. 3d 912, 916, 832 N.E.2d 246 (2005).

### B. Discussion

In child support cases where the statutory guidelines apply, a court determines the minimum amount of support based on the applicable guideline percentage of the parent's "net income." 750 ILCS 5/505(a)(1) (West 2004). Section 505(a)(3) defines "net

14

No. 1-06-2866

income" as follows:

"'Net income' is defined as the total of all income from all sources, minus the following deductions:

(a) Federal income tax (properly calculated withholding or estimated payments);

(b) State income tax (properly calculated withholding or estimated payments);

(c) Social Security (FICA payments);

(d) Mandatory retirement contributions required by law or as a condition of employment;

(e) Union dues;

(f) Dependent and individual health/hospitalization insurance premiums;

(g) Prior obligations of support or maintenance actually paid pursuant to a court order;

(h) Expenditures for repayment of debts that represent reasonable and necessary expenses for the production of income, medical expenditures necessary to preserve life or health, reasonable expenditures for the benefit of the child and the other parent, exclusive of gifts. The court shall reduce net income in determining the minimum amount of support to be ordered only for the period that such payments are due and shall enter an order containing provisions for its self-executing modification upon termination of such

15

payment period."  750 ILCS 5/505(a)(3) (West 2004).

Courts should construe a statute in a way that avoids absurd, unreasonable, unjust or inconvenient results.  In re Mary Ann P., 202 Ill. 2d 393, 406, 781 N.E.2d 237 (2002).

### 1.  Mortgage Loan Proceeds

Susan maintains that the mortgage loan Craig took out to purchase his present residence should be included in his net income for child support purposes.  Susan relies on this court's decision in In re Marriage of Rogers, 345 Ill. App. 3d 77, 802 N.E.2d 1247 (2003) (Rogers I), aff'd, 213 Ill. 2d 129, 820 N.E.2d 356 (2004) (Rogers II).

In Rogers I, the father argued that gifts and loans from his parents were not income.  After determining that the gifts were income, this court rejected the father's argument that because proceeds of loans to him from his parents were not income for federal tax purposes, they are not income for determining child support.  This court held that section 505, not the tax code, defined income for child support purposes.  In the absence of any authority that loan proceeds were excluded from net income, they, along with the gifts, were to be included in calculating child support payments.  Rogers I, 345 Ill. App. 3d at 80-81.

The supreme court granted leave to appeal and affirmed the appellate court.  Rogers II, 213 Ill. 2d 129.  Noting that section 505 did not separately define "income," the court relied on its plain and ordinary meaning as follows:

16

"As the word itself suggests, 'income' is simply 'something that comes in as an increment or addition ***: a gain or recurrent benefit that is usu[ually] measured in money ***: the value of goods and services received by an individual in a given period of time.' [Citation.]   It has likewise been defined as '[t]he money or other form of payment that one receives, usu[ually] periodically, from employment, business, investments, royalties, gifts, and the like.'" Rogers II, 213 Ill. 2d at 136-37, quoting Webster's Third New International Dictionary 1143 (1986); and Black's Law Dictionary 778 (8th ed. 2004).

After agreeing that gifts were to be included in net income, the court observed as follows:

"This leaves only the matter of the annual 'loans' given to the father by his parents.  For purposes of determining a parent's net income, section 505 of the Act authorizes the deduction of amounts expended in repayment of certain types of debts.  There is no corresponding provision authorizing the exclusion of loan proceeds.  Accordingly, the appellate court reasoned that under the language of the Act, the circuit court acted correctly when it included the money the father's parents loaned him when it calculated his support obligations. [Citation.]

Although the father challenges the appellate court's construction of the statute, we have no occasion in this

17

case to address whether and under what circumstances loan proceeds are properly regarded as an element of income for child support purposes. The reason for that is that the sums at issue are loans in name only." Rogers II, 213 Ill. 2d at 139-40.

The father had never been required to repay the "loans" received from his parents. Therefore, the court concluded that they should be treated like the gifts to him from his parents and his income from his teaching job and upheld the appellate court's determination that they should be considered in determining the father's net income under section 505(a)(3). Rogers II, 213 Ill. 2d at 140.

Subsequently, in In re Marriage of Tegeler, 365 Ill. App. 3d 448, 848 N.E.2d 173 (2006), the Second District Appellate Court disagreed with the determination in Rogers I that loan proceeds were to be considered income under section 505(a)(3). One of the issues in Tegeler was whether a line of credit was a resource for child support purposes. After noting that Rogers II did not reach the issue of whether loans would qualify as income under section 505(a)(3), the court stated as follows:

"We believe that, in general, loans should not be considered income. We note that the Black's Law Dictionary definition of 'income' quoted by the supreme court in Rogers II, cited earlier in our opinion, specifically includes gifts as income but does not mention loans. [Citation.]

18

No. 1-06-2866

More significantly, loans typically should not be counted as income because they usually do not directly increase an individual's wealth." (Emphasis in original.) Tegeler, 365 Ill. 3d at 458.

Although the father received as much as $600,000 in annual loans for the running of his farm, neither the loans nor the repayment were considered in his income calculations. The court agreed, explaining as follows:

"A contrary interpretation that includes loans as income would often created unjust or absurd results. *** Should a parent who takes out tens of thousands of dollars in student loans for graduate school be credited with an equal amount of 'income' for those years? Should a parent who borrows hundreds of thousands of dollars for a mortgage to buy a house be considered to have that much additional 'income' that year? In the mortgage example, even the comparatively small monthly mortgage payments could not be deducted from the inflated income, for a home mortgage is not an expense that produces income [citation] nor does it fall within any other enumerated deduction." Tegeler, 365 Ill. App, 3d at 458.

See 750 ILCS 5/505(a)(3)(h) (West 2004). While recognizing that there may be a situation in which it would be appropriate to consider loans as income under section 505(a)(3), the court concluded that the trial court did not err in not including the

19

No. 1-06-2866

father's loans in its income calculation. <u>Tegeler</u>, 365 Ill. App. 3d at 459; but see <u>Cox v. Cox</u>, 580 N.E.2d 344 (Ind. App. 1991) (father's $300,000 line of credit which he used for personal expenses as well as his farming operation afforded him great economic flexibility and was properly considered in determining his financial condition).

In the absence of case law involving mortgage loans, the parties rely on the analysis in student loan cases. In <u>Gilbertson v. Graff</u>, 477 N.W.2d 771 (Minn. App. 1991), the reviewing court found that the excess proceeds from a student loan, used for living expenses, were properly included in the father's income for child support purposes. The court relied on the state statute defining income as any form of periodic payment to an individual. <u>Gilbertson</u>, 477 N.W.2d at 774; Minn. Stat. Ann. §518.54 subd. 6 (West 2006); see <u>In re Marriage of Syverson</u>, 281 Mont. 1, 12, 931 P.2d 691, 698 (1997) (that portion of a Pell Grant, which did not require repayment, for personal use constituted income). Still another court has held that the grants and tuition reimbursements from employers, not to exceed the amount of the tuition, were not income for child support purposes because they did not reduce a parent's living expenses. <u>In re Marriage of Mellott</u>, 32 Kan. App. 2d 1031, 1033-34, 93 P.3d 1219, 1221-22 (2004).

Craig relies on <u>In re Marriage of Thibadeau</u>, 150 Wis. 2d 109, 441 N.W.2d 281 (Wis. App. 1989). In that case, the

20

reviewing court held that the trial court's inclusion of the mother's Pell Grant and loans in her income was error. The Wisconsin statute defined "gross income" as any income from what ever source, unless excluded by law, and the mother's educational grants were excluded by federal law. The court also determined that the loans were not "gross income" because under the Internal Revenue Code, money borrowed by a tax payer was not income in the year received. Thibadeau, 150 Wis. 2d at 120, 441 N.W.2d at 284; see also Milligan v. Addison, 582 So.2d 769 (Fla. App. 1991), overruled on other grounds, Overbey v. Overbey, 698 So. 2d 811, 815 (Fla. 1997) (educational loans are not income because such monies represent debts which must be repaid); Schaerrer v. Westman Commission Co., 769 P.2d 1058 (Colo. 1989) (student loans not subject to garnishment for preexisting debts because state garnishment laws were inconsistent with the Federal Guaranteed Student Loan Program).

The problem with the above cases is that they rely on statutory definitions peculiar to that state and/or federal tax law. As previously stated, the Act does not define income, and as this court held in Rogers I, section 505, not the tax code, defines income for determination of child support. Rogers I, 345 Ill. App. 3d at 80. Nonetheless, the analysis in In re Marriage of Rocha, 68 Cal. App. 4th 514, 80 Cal. Rptr. 2d 376 (1998), is somewhat helpful.

In Rocha, for purposes of determining child support, the

No. 1-06-2866

statute defined "annual gross income" as "income from whatever source derived," except child support payments actually received, and public aid, and included but was not limited to the following:

"(1) Income such as commissions, salaries, royalties, wages, bonuses, rents, dividends, pensions, interest, trust income, annuities, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, social security benefits, and spousal support actually received from a person not a party to the proceeding to establish child support order under this article. (2) Income from the proprietorship of a business, such as gross receipts from the business reduced by expenditures required for the operation of the business. (3) In the discretion of the court, employee benefits or self-employment benefits, taking into consideration the benefit to the employee, any corresponding reduction in living expenses, and other relevant facts." Rocha, 68 Cal. App. 4th at 516, 80 Cal. Rptr. 2d at 377.

The trial court concluded that the failure of the above list to mention loans as a source of income did not exclude them. The reviewing court disagreed.

The court observed that sources of income listed in the statute and its prior case law all represented a source of income where there was no expectation of repayment or reimbursement.

22

No. 1-06-2866

After discussing the decisions in several of the cases set forth above, the court determined that the better approach "is to simply recognize that a student loan is not income. It does not expressly qualify under the guidelines set forth in [the California statute], nor do such loans share similar features with those specifically enumerated items designated to qualify as income. We therefore conclude that the trial court erred in considering the difference in student loan funds used for living expenses as income." Rocha, 68 Cal. App. 4th at 517-18, 80 Cal. Rptr. 2d at 378.

Unlike the statute in Rocha, the Act does not set forth what is considered income; rather, it sets forth only those items that can be deducted from it. Therefore, there is no list from which this court may compare loans to see whether they share similar features with those considered to be income. Nonetheless, a determining factor in many of the above cases is whether repayment of the money received was required. Where repayment was required, the loan was not considered income. While in Rogers II the supreme court upheld the appellate court's determination that the "loans" in that case were income, it did so on the basis that loans were "loans in name only." Rogers II, 213 Ill. 2d at 140. In other words, no repayment was required or even intended when those loans were made.

We do not hold that loan proceeds may never constitute income. However, a residential mortgage loan, made by a bona

23

fide lender, does not constitute income. Such loans do not meet the definition of "income" as set forth in Rogers II as they do not share similar features with the examples set forth in the definition cited therein.

### 2. Sale Proceeds

In the circuit court, Susan argued that a question of fact existed as to whether Craig utilized the proceeds from the sale of his California residence in the purchase of his new residence in Illinois. The circuit court determined that no issue of fact existed. On appeal, Susan has abandoned her argument that a question of fact exists barring summary judgment. Instead, she contends that, regardless of how he actually used the proceeds, the proceeds from the sale of Craig's residence should be considered income for the purpose of determining net income for child support.

Susan's argument on appeal suggests a broader question than is actually before us. The circuit court's grant of summary judgment was based on Craig's affidavit in which he averred that the proceeds from the sale of his California residence were used to purchase his new residence in Illinois.[4] Our review is limited to determining whether proceeds from the sale of residential property that are used to purchase a new residence

---

[4]Craig's affidavit also stated that the proceeds were initially placed in a trust for his daughter.

are income for child support purposes.

"For the purposes of determining statutory child support obligations, the General Assembly has adopted an expansive definition of what constitutes 'net income.' 'Net income' is defined broadly to encompass 'the total of all income from all sources'" minus the deductions set forth in section 505(a)(3). Rogers II, 213 Ill. 2d at 136, quoting 750 ILCS 5/505(a)(3) (West 2002). Susan points out that section 505(a)(3) does not exclude residential real estate sale proceeds in determining net income.

The parties cite no Illinois cases deciding this precise issue. However, Susan maintains that in In re Marriage of Garelick, 168 Ill. App. 3d 321, 522 N.E.2d 738 (1988), the court determined that a capital gain realized from the husband's business with his new wife was subject to his maintenance obligation to his former wife. Garelick does not so hold. In that case, the court rejected the husband's argument that there was no evidence that he would have future income from the business in light of the capital gain he realized and which he used as a down payment on his current residence. Garelick, 168 Ill. App. 3d at 327.

Craig's reliance on In re Marriage of Steinberg, 302 Ill. App. 3d 845, 853, 706 N.E.2d 895 (1998), is equally misplaced. In that case, the father argued that the proceeds from the sale of the marital residence should not have been included in calculating his income. The reviewing court noted that the trial

25

court had agreed with the father on that point.  As whether the sales proceeds were income for child support was not an issue in that case, <u>Steinberg</u> is of no assistance in this case.

As noted in our discussion of loan proceeds as income, the Act does not define "income."  We therefore turn again to the definition set forth by the supreme court in <u>Rogers II</u>.  Under that definition, income is viewed as a gain or recurrent benefit, measured in money and as money from employment, business, investments, royalties, gifts and the like.  See <u>Rogers II</u>, 213 Ill. 2d at 136.  Courts have included as income under the Act a lump-sum worker's compensation award, a military allowance, an employee's deferred compensation and the proceeds from a firefighter's pension.  See <u>In re Marriage of Lindman</u>, 356 Ill. App. 3d 462, 466, 824 N.E.2d 1219 (2005) (collected cases).  In <u>Lindman</u>, the appellate court held that the father's individual retirement account disbursements were income for the purpose of calculating net income under section 505 of the Act (750 ILCS 5/505 (West 2002)).

In <u>Department of Public Aid ex rel. Jennings v. White</u>, 286 Ill. App. 3d 213, 675 N.E.2d 985 (1997), the appellate court held that a father's Federal Employers' Liability Act settlement was income for child support purposes.[5]  In reaching its decision,

---

[5]Because the father in <u>Jennings</u> failed to provide information regarding the breakdown of the award, the appellate

the court noted that the legislature's inclusive language "'all income from all sources,'" was to be broadly applied, and thus "income" had been construed to included various items such as: a tax refund attributable to maintenance payments made to a former spouse; income from investments and bonuses from a closely held corporation; and nonrecurring income.  See Jennings, 286 Ill. App. 3d at 217-18 (collected cases).

While maintaining that this court need not look past the unambiguous language of section 505(a)(3), Susan notes that other jurisdictions include capital gains in their statutory definitions of income for child support purposes.  See Moore v. Moore, No. E2005-02369-SC-R11-CV, ___ S.W.3d ___ (Tenn. 2007) (even a one-time capital gain was income under the child support guidelines which specifically included capital gains in the definition of gross income); see also Sharpe v. Perkins, 284 Ga. App. 376, 644 S.E.2d 178 (2007) (rejecting father's claim that nonrecurring capital gains from the sale of property should not be included in his income, relying on the statute which excluded only public assistance from income determination and on the internal revenue code's definition of gross income).

In Borowsky v. Borowsky, 273 Mich. App. 666, 733 N.W.2d 71

---

court upheld the trial court's determination that the entire award, after deduction of expenses, was subject to his child support obligation.  Jennings, 286 Ill. App. 3d at 218-19.

(2007), the reviewing court noted that the Michigan Child Support Formula (MCSF) did not directly address gains from the sale of property. However, the MCSF did provide that "income" included an amount of money that is due to an individual as a debt of another individual or other entity. The court concluded that because gains from the sale of property fall within the broad definition of income as provided in the MCSF and were not specifically excluded from treatment as income, unlike inheritances and one-time gifts, gains from the sale of property must be included as income for purposes of calculating child support, regardless of how the funds were actually used. Borowsky, 273 Mich. App. at 680, 733 N.W.2d at 78.

Relevant to the present case, in a footnote, the Borowsky court acknowledged as follows:

"We are cognizant that one-time sales of real property can create a distorted impression of a party's income for purposes of calculating child support. However, we note that, where such distortion renders application of the formula unjust or inappropriate, it is within the trial court's discretion to deviate from the formula and exclude such amounts from treatment as income on that basis. [Citation.]" Borowsky, 273 Mich. App. at 681 n.8, 733 N.W.2d at 80 n.8.

Borowsky involved the capital gain realized from rental property. Our research reveals only one case specifically

28

addressing whether the proceeds from the sale of a residence are income for purposes of child support. In Eldridge v. Eldridge, 137 S.W.3d 1 (Tenn. App. 2002), the wife argued that the capital gains associated with the sale of the parties' residence should be included when the court determined the husband's income for child support purposes. The Tennessee court agreed. Initially, the court noted that capital gains were included in the definition of gross income under the Tennessee statute. The court further noted a previous decision in which it held that a one time capital gain should be included in the determination of the obligor's income. See Smith v. Smith, No. 01A-01-9705-CH-00216 (Tenn. App. October 29, 1997). The court distinguished another decision in which it excluded a capital gain from gross income on the basis that the capital gain was included in the marital estate. See Hall v. Hall, 03A01-9701-GS-00030 (Tenn. App. 1997 July 21, 1997).[6] As there was no evidence that the $340,000 capital gain was included in the marital estate, the appellate court directed the trial court to consider the $340,000 capital gain when it determined the husband's income for child support purposes. Eldridge, 137 S.W.3d at 22.

The above cases deal with the capital gains realized from the sale of real estate. However, Susan is seeking to include the entire proceeds from the sale of Craig's California residence

---

[6]Hall was abrogated in Moore.

No. 1-06-2866

as income for child support purposes.  Under section 505(a)(3)
and the definition of income cited in Rogers II, we are
constrained to agree with Susan that the proceeds from the sale
of property such as a residence would qualify as income.

Nonetheless, we do not agree that the circuit court erred in
refusing to include the proceeds in its determination of net
income.  As a practical matter, it stands to reason that to a
certain extent the sale proceeds represent a return on payments
made by Craig out of income already accounted for in the
determination of his child support obligation.  Moreover, we find
In re Marriage of Harmon, 210 Ill. App. 3d 92, 586 N.E.2d 948
(1991), overruled on other grounds, Rogers II, 213 Ill. 2d at 139
instructive.[7]

In Harmon, the court noted that passive income from bonds or
securities could be considered when determining net income.
Harmon, 210 Ill. App. 3d at 95.  However, "when the unrefuted
testimony is that the party does not actually receive the income
from such passive sources, regardless of whether it is reported
for Federal income tax purposes, it is not error for the trial
court to refuse to consider the additional reported amounts when
calculating net income."  Harmon, 210 Ill. App. 3d at 95-96.[8]  In

------

[7]Rogers II overruled Harmon on the issue of whether gifts
could be considered income for purposes of child support.

[8] We note that the courts in In re

30

*Ivanyi v. Granoff*, 171 Ill. App. 3d 411, 526 N.E.2d 189 (1988), while the father was required to report interest, dividends and capital gains on his federal income tax, the court held that they

_____

*Marriage of Colangelo*, 355 Ill. App. 3d 383, 822 N.E.2d 571 (2005), and *In re Marriage of Klomps*, 286 Ill. App. 3d 710, 676 N.E.2d 686 (1997), refused to follow *Harmon*, finding that the fact that the source of income was awarded as a marital asset did not prevent its inclusion as income for child support purposes. See *Colangelo*, 355 Ill. App. 3d at 390-92 (stock distribution); *Klomps*, 286 Ill. App. 3d at 715 (military pension). That is not an issue in this case.

No. 1-06-2866

should not be considered in determining net income since he did not receive this income, either actually or constructively. Ivanyi, 171 Ill. App. 3d at 421.

A similar situation occurs where a parent sells his or her residence and uses the proceeds to purchase a new residence. The sale proceeds are not actually available to the parent to spend as income. While it could be argued that they are "constructively" available, such an interpretation would be detrimental not only to the parent obligated for support but the child or children for whom support is being paid. In the present case, Craig sold his California residence when he lost his job and had relocate to Illinois for employment. As the circuit court observed, treating as income the sale proceeds from one residence which are needed to finance the purchase of another residence would serve to discourage the parent paying child support from relocating in order to obtain employment necessary to continue his or her child support obligation.

We cannot say that the proceeds from the sale of residential property can never be considered income for child support purposes. Here, however, the sale of Craig's California residence was necessitated by his employment situation, and the proceeds were utilized to purchase his residence in Illinois where he had obtained employment. Under these circumstances, the circuit court did not err in excluding the proceeds from the sale of Craig's California from his income for child support purposes.

32

III.  Deductibility of Nonreimbursed Business Expenses

Susan contends that the circuit court erred in determining that Craig's nonreimbursed business expenses were deductible pursuant to section 505(a)(3)(h) of the Act (750 ILCS 5/505(a)(3)(h) (West 2004).  Craig maintains that Susan may not raise this issue on appeal because she stipulated to his offer of proof as to the amount of each business expense, the date and purpose of each expense, the amount paid and how it was paid, and the proof of the payments.  However, the record is clear that the stipulation was to the list of business expenses, and Susan reserved the right to argue their propriety as deductions.

A.  Standard of Review

This court applies de novo review to the construction of a statute.  R&B Kapital, 358 Ill. App. 3d at 916.

B.  Discussion

Section 505(a)(3(h) provides as follows:

"Expenditures for repayment of debts that represent reasonable and necessary expenses for the production of income, medical expenditures necessary to preserve life or health, reasonable expenditures for the benefit of the child and the other parent, exclusive of gifts.  The court shall reduce net income in determining the minimum amount of support to be ordered only for the period that such payments are due and shall enter an order containing provisions for its self-executing modification upon termination of such

33

payment period."  750 ILCS 5/505(a)(3)(h) (West 2004).
In Rimkus v. Rimkus, 199 Ill. App. 3d 903, 557 N.E.2d 638 (1990),
this court held that nonreimbursed business expenses were
expenditures for the repayment of debt and thus deductible under
section 505(a)(3)(h) as long as they were "'reasonable and
necessary'" for the production of income.  Rimkus, 199 Ill. App.
3d at 910, quoting Ill. Rev. Stat. 1987, ch. 40, par.
505(a)(3)(h).

1.  Reasonable and Necessary

Susan argues that Craig failed to prove that the expenses
were reasonable and necessary for the production of income
because his business consistently lost money.  In Gay v. Dunlap,
279 Ill. App. 3d 140, 664 N.E.2d 88 (1996), the court determined
whether an expense was  "reasonable" by looking at "the
relationship between the amount of the expense and the amount by
which income is in good faith expected to increase as a result."
Gay, 279 Ill. App. 3d at 149.  Susan points out that the
nonreimbursed business expenses claimed by Craig exceeded his
income for the same time period and, therefore, they cannot be
said to be reasonable.

Susan cites no authority for the proposition that the fact a
business had more expenses than income is, in and of itself,
evidence that the expenses were not reasonable or necessary.  As
the court in Gay noted, "[t]his definition [of 'reasonable']
implies the same expense could be reasonable in one context and

34

not in another." Gay, 279 Ill. App. 3d at 149. While it was not unreasonable for the father to rent a car for his business purposes, the court remanded the case for hearing on whether leasing a Mercedes brand vehicle was a reasonable and necessary expense. Gay, 279 Ill. App. 3d at 149.

In Tegeler, the mother argued that the father's testimony that his expenses were reasonable and necessary was insufficient in the absence of any receipts substantiating such expenses. The court rejected the argument pointing out that the father's tax returns showed itemized totals of expenses and his farm account books showed very detailed lists of expenditures complete with dates, check numbers, payees, descriptions of items and amounts. The court concluded that such evidence constituted a prima facie showing that such expenses were legitimate, which the mother failed to rebut. Tegeler, 365 Ill. App. 3d at 456.

Likewise, in the present case, Craig's nonreimbursed business expenses, as stipulated to by Susan, constituted a prima facie showing that the expenses were legitimate. While Susan did not stipulate to their reasonableness, her argument, based solely on the lack of profit, does not rebut the reasonableness of the expenses.

### 2. Repayment of Debt

Susan maintains that Craig's nonreimbursed business expenses are not deductible under section 505(a)(3)(h) because they were not for the repayment of debt and urges us to overrule Rimkus.

35

Susan argues that Rimkus ignored the language in section 505(a)(3)(h) that, to be deductible, the expenses must be for the repayment of debt. She points out that in Gay, the Fourth District Appellate Court disagreed with Rimkus and held that day-to-day business expenses were not deductible for the purpose of determining net income for child support.

In Gay, the court explained that, to adopt the Rimkus reasoning, would require the court to ignore the language "for repayment of debts." The court further noted that under the Rimkus interpretation, the language requiring the court to order the amount of support reduced only for the period wherein the debt was being repaid would make no sense. Gay, 279 Ill. App. 3d at 147; see Einstein v. Nijim, 358 Ill. App. 3d 263, 831 N.E.2d 50 (4th Dist. 2005) (agreeing with Gay that the repayment language applies to all three types of deductions under section 505(a)(3)(h) and upholding denial of deductions for ongoing medical expenses); see also In re Marriage of Ackerley, 333 Ill. App. 3d 382, 775 N.E.2d 1045 (2d Dist. 2002) (mandatory loans from father's bonuses did not represent repayment of debt as they represented sums the father would receive at a later date).

We note that Rimkus relied on In re Marriage of Dwan, 108 Ill. App. 3d 808, 439 N.E.2d (1982), for its conclusion that nonreimbursed business expenses were deductible to determine net income. Rimkus, 199 Ill. App. 3d at 909. However, Dwan was decided under the 1979 version of section 505, which did not

provide a definition of net income.  Gay, 279 Ill. App. 3d at
146.  Moreover in Dwan, the temporary court order defined net
income as income less taxes and business expenses.  Rimkus, 199
Ill. App. 3d at 909.  In the present case, the agreed order
provides that the statutory definition of net income controls.

Nonetheless, we disagree with Susan and the court in Gay
that Rimkus was wrongly decided.  Subsection (a)(3)(h) does not
limit "debt" to a one-time-only business expense.  "Debt" is
defined as "[l]iability on a claim; a specific sum of money due
by agreement or otherwise."  Black's Law Dictionary 410 (7th ed.
1999).  Gay does not explain why repaying debts incurred for day-
to-day business expenses is any different from paying a one-time
business expense, except that such an interpretation conflicts
with the requirement of a repayment plan.  Gay, 279 Ill. App. 3d
at 147.

Our courts have allowed business expenses to be deducted when
arriving at net income where the expenses were subject to a
strict repayment plan.  In In re Marriage of Davis, 287 Ill. App.
3d 846, 679 N.E.2d 110 (5th Dist. 1997), the court determined
that the father's purchase of a dental practice and building
partnership interest was a reasonable and necessary expense for
the production of income.  The court further held that the father
was entitled to deduct whatever the straight-line appreciation
expense would have been since his payments were subject to a
specific repayment schedule.  Davis, 287 Ill. App. 3d 846; see

37

No. 1-06-2866

Posey v. Tate, 275 Ill. App. 3d 822, 827, 656 N.E.2d 222 (1st Dist. 1995) (straight-line depreciation expense deduction proper where it was for a reasonable and necessary business expense and it was subject to a specified repayment schedule as contemplated by section 505(a)(3)(h).

On the other hand, in the absence of a repayment schedule, courts have disallowed the deduction for expenses. In In re Marriage of Partney, 212 Ill. App. 3d 586, 571 N.E.2d 266 (5th Dist. 1991), the reviewing court disallowed deductions under section 505(a)(3)(h) for real estate investment losses because they were not shown to be reasonable or necessary for the production of income and because, as such, the losses could not be presented in a specified repayment schedule. Partney, 212 Ill. App. 3d at 593. In In re Marriage of Lefler, 185 Ill. App. 3d 677, 542 N.E.2d 1 (1st Dist. 1988), the reviewing court refused to allow the father a deduction for his business indebtedness arising out of an Internal Revenue Service lien in the absence of evidence as to the amount and a specific repayment schedule. Lefler, 185 Ill. App. 3d at 684-85.

Under subsection (a)(3)(h), the debt repayment may reduce net income only for the period the payments are due, and the modification must be self-executing. The agreed order in this case provides that each year Craig's income will be reviewed to determine whether his support obligation should increase or decrease. This determination will be made on the basis of his

38

income tax returns, which will reflect his nonreimbursed business expenses. Thus, each year Craig's income will be reduced only by those nonreimbursed business expenses incurred for that year. Thus, the agreed order complies with subsection (a)(3)(h) in that Craig's nonreimbursed business expenses will be deductible only in the year he repays them and is self-executing. But see Partney, 212 Ill. App. 3d at 592-93 (amount of net loss on investment properties was an end-of-the-year accounting which corresponded only to that particular year and did not evidence a repayment plan).

We conclude that Craig's nonreimbursed business expenses are deductible under section 505(a)(3)(h) of the Act.

IV. Unexplained Bank Deposits

A. Standard of Review

This court reviews a trial court's evidentiary rulings under an abuse of discretion standard. Chapman v. Hubbard Woods Motors, Inc., 351 Ill. App. 3d 99, 105, 812 N.E.2d 389 (2004). A trial court will be said to have abused its discretion only if it acts arbitrarily without the employment of conscientious judgment, exceeds the bounds of reason and ignores recognized principles of law or if no reasonable person would take the position adopted by the court. Schmitz v. Binette, 368 Ill. App. 3d 447, 452, 857 N.E.2d 846 (2006).

. B. Discussion

Susan contends that the circuit court erred when it

39

sustained Craig's objection to her questions regarding deposits to his bank accounts. She maintains that the court erroneously placed on her the burden of proving that Craig's unexplained deposits into his bank accounts were income for child support. Susan argues that as all income is presumptively income for child support purposes, it was Craig's burden to prove that the deposits were not income for child support purposes. Susan relies on Rogers I wherein the court required the father to prove that the gifts and loans were not income. Rogers I, 345 Ill. App. 3d at 79-81. She also relies on In re Marriage of Jorczak, 315 Ill. App. 3d 954, 957, 735 N.E.2d 182 (2000) (payment is an affirmative defense to a child support arrearage claim; therefore the burden of proof is on the one claiming the defense of payment).

More on point is Tegeler. There the mother claimed that the father's personal checking account was another source for computing child support. The father testified that he never wrote checks from his farm accounts to his personal account. While he did deposit money from the sale of grain and cattle into his personal account, he recorded the sales' proceeds in his farm account books. The court found that the father "partially explained the source of funding for his checking account. However, to the extent that [the father's] personal spending exceeded his 'net income' *** we agree that the source of such money is unexplained and should be considered [extra income.]"

40

(Emphasis in original.) Tegeler, 365 Ill. App. 3d at 461.

In the present case, the trial court sustained the relevancy objection on the grounds that there was no proof that the deposits were Craig's or that the deposits were from income over and above what he had already disclosed as income. Under questioning by his own attorney, Craig explained that in 2002, some of the deposits could have come from his NeoPharm paychecks. He further explained that the deposits could have been made by his present wife, Jeanine, from her income or accounts.

As was the case in Tegeler, Craig provided an explanation of where the deposits he could not specifically recall may have come. Moreover, unlike the father in Tegeler, there was no evidence that Craig's personal spending exceeded his net income. Compare Tegeler, 365 Ill. App. 3d at 460 (the father spent an average of $72,000 when his net income was between $50,000 and $70,000).

We conclude that the circuit court's sustaining of the relevancy objection was not error.

### V. Contempt

#### A. Standard of Review

A trial court's contempt finding is reviewed under the abuse of discretion standard. Steinberg, 302 Ill. App. 3d at 853.

#### B. Discussion

Susan contends that the circuit court abused its discretion

when it failed to hold Craig in contempt for failure to pay child support.  She points to Craig's admission that he owed additional child support for the years 2003 and 2004.[9]

"'The power to enforce an order to pay money through contempt is limited to cases of willful [and contumacious] refusal to obey the court's order.'"  Steinberg, 302 Ill. App. 3d at 853, quoting In re Marriage of Logston, 103 Ill. 2d 266, 285, 469 N.E.2d 167 (1984).  "The failure to pay child support under a court order or judgment is prima facie evidence of indirect, civil contempt."  Steinberg, 302 Ill. App. 3d at 853.  Where the evidence establishes that the payor-parent has failed to make support payments, the burden is on the payor-parent to show that the noncompliance was not willful.  Steinberg, 302 Ill. App. 3d at 853.  Whether the excuse given for noncompliance is valid is a question of fact for the court.  Steinberg, 302 Ill. App. 3d at 853.

Craig responds that he was in compliance with the monthly court-ordered support amount of $762.  He further responds that the parties' dispute as to the additional support due for each year resulted from the vagueness of the circuit court's order

---

[9]Craig testified that he overpaid $1,679.72 child support for 2002; for 2003, he paid $9,144 and owed an additional 3,392.60; and for 2004, he paid $9,144 and owed an additional $1,896.23.

No. 1-06-2866

regarding the calculation of the additional amount.

"'To support a finding of contempt, the order must be 'so specific and clear as to be susceptible of only one interpretation.'" Steinberg, 302 Ill. App. 3d at 853, quoting O'Leary v. Allphin, 64 Ill. 2d 500, 514, 356 N.E.2d 551 (1976). "'It must not only be capable of reasonable interpretation, but that interpretation must be to the exclusion of other reasonable interpretations; it must be unambiguous.'" Steinberg, 302 Ill. App. 3d at 853, quoting O'Grady v. Cook County Sheriff's Merit Board, 204 Ill. App. 3d 258, 262, 561 N.E.2d 1226 (1990).

In Steinberg, the father appealed contempt findings based on his failure to pay child support and the failure to disclose his tax returns. The order for child support included a provision whereby, in the event the father's income increased or decreased, he agreed to modify his payments to insure that they were never less (or more) than 20% of his net annual income. In order to determine if a modification was required, the parties were to exchange federal income tax forms, W-2s and 1099s. The father argued that the modification terms of the order were too vague to put him on notice that his actions could constitute contempt of court. He further argued that he believed the agreement was unenforceable because the support level was not stated in a dollar amount, as required by the version of the Act applicable in the case.

The reviewing court rejected the vagueness argument, finding

43

that "though calculating child support under the agreement requires some effort each year, the terms of the agreement set out a clear formula" and therefore were sufficient to put the father on notice about the conduct that would violate the order. Steinberg, 302 Ill. App. 3d at 853. As to the father's argument that he had not acted willfully or in bad faith, the court stated as follows:

"[The father] notes that he regularly paid child support and twice raised the amount. He stresses that he believed the agreement was unenforceable. But the issue here is not whether the respondent acted with good intentions in paying what he thought was appropriate support. The issue is whether he made a good-faith effort to comply with the formula set out in the dissolution agreement. [The father] believes he was justified in ignoring the order because he thought the child support provisions were void. As the trial court noted, [the father] offered no evidence to show that he tried to comply with the order. Though [the father] argues that the child support directions were too confusing to understand, his testimony reveals the opposite. If he concluded that the order was contrary to appellate opinions, he must have had a clear notion of what the order meant. The trial court did not err in finding that [the father's] failure to comply was willful." Steinberg, 302 Ill. App. 3d at 853-54.

44

In this case, there was some dispute of what constituted income and what were allowable deductions. Prior to the filing of the contempt petition, Craig maintained in letters to Susan that he had either overpaid his support obligation or fulfilled his obligation for the additional support. Craig even hired an attorney to assist him in the calculations for 2002 and 2003. Nonetheless, at trial, Craig acknowledged and the circuit court found that he owed the additional support.

A trial court will be said to have abused its discretion only if it acts arbitrarily without the employment of conscientious judgment, exceeds the bounds of reason and ignores recognized principles of law, or if no reasonable person would take the position adopted by the court. Schmitz, 368 Ill. App. 3d at 452. Even though Craig ultimately conceded that he owed additional support, his conduct prior to the filing of the petition did not indicate that he willfully disregarded the requirements of the support order.

We conclude that the circuit court's refusal to find Craig in indirect civil contempt was not an abuse of discretion.

VI. Discovery Sanction

A. Standard of Review

This court reviews a decision to impose or not impose sanctions under the abuse of discretion standard. Chabowski v. Vacation Village Ass'n, 291 Ill. App. 3d 525, 528, 690 N.E.2d 115 (1997). The circuit court is in the best position to determine

No. 1-06-2866

how court rules and rules of procedure should be applied in the cases before it, and thus, its decisions are entitled to considerable deference upon review. In re Estate of Smith, 201 Ill. App. 3d 1005, 1009, 559 N.E.2d 571 (1990). The predicate to such deference is that the court make an informed and reasoned decision. Smith, 201 Ill. App. 3d at 1009.

### B. Discussion

Susan contends that the circuit court abused its discretion when it sanctioned her for subpoenaing Craig's attorneys. She maintains that she was entitled to depose Mr. Ramirez because Craig raised the issue of Mr. Ramirez's advice in his affirmative defense, and thus waived any attorney-client privilege. As to Ms. Campbell, Susan asserts she sought Ms. Campbell's deposition because her name appeared on the letterhead of Craig's company. In response, Craig maintains that Susan was required to seek the least intrusive discovery means to obtain the information she sought.[10]

Supreme Court Rule 219 (d) provides that "[i]f a party wilfully obtains or attempts to obtain information by an improper discovery method, wilfully obtains or attempts to obtain

---

[10]Although the circuit court orally denied Rule 219(d) sanctions, both parties are proceeding on the theory that the sanctions for subpoenaing the attorneys were imposed under Rule 219(d).

46

information to which that party is not entitled, or otherwise abuses these discovery rules, the court may enter any order provided for in paragraph (c) of this rule." 210 Ill. 2d R. 219(d). Under paragraph (c), the court may order the offending party to pay the other party's expenses incurred as a result of the misconduct, including a reasonable attorney fee and a monetary penalty. 210 Ill. 2d R. 219(c).

In Kilpatrick v. First Church of the Nazarene, 182 Ill. App. 3d 461, 538 N.E.2d 136 (1989), the plaintiff required one of the defendant's attorneys to testify as part of an offer of proof. After determining that the questioning did not and was not likely to elicit new and relevant facts, the trial court concluded that requiring the defendant's attorney to testify was a tactic to exert pressure on opposing counsel during trial and constituted unjustified harassment and awarded sanctions.

In upholding the award of sanctions, the reviewing court acknowledged the difficulties of having counsel testify. The court quoted from the case of Shelton v. American Motors Corp., 805 F.2d 1323 (8th Cir. 1986), as follows:

"'Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. *** Finally, the practice of deposing opposing counsel detracts from the quality of client representation. Counsel should be free to devote his

47

or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent. Moreover, the "chilling effect" that such practice will have on the truthful communications from the client to the attorney is obvious.

* * *

*** The harassing practice of deposing opposing counsel (unless that counsel's testimony is crucial and unique) appears to be an adversary trial tactic that does nothing for the administration of justice but rather prolongs and increases the cost of litigation, demeans the profession, and constitutes an abuse of the discovery process." Kilpatrick, 182 Ill. App. 3d at 470, quoting Shelton, 805 F.2d at 1327-30.

Like the present case, Shelton concerned the taking of the opposing counsel's deposition. Refusing to hold that opposing counsel was absolutely immune from being deposed and recognizing that circumstances may arise in which the court should order the taking of opposing counsel's deposition, the Shelton court limited those circumstances to "where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel [citation]; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." Shelton, 805 F.2d at 1327; see also J. Kinsler, J. Grenig & L. Nale, 10 Ill.

48

No. 1-06-2866

Practice, Civil Discovery §1.38 (2000), citing <u>Jones v. Board of Police Commissioners of Kansas City</u>, 176 F.R.D. 625 (W.D. Mo. 1997) (applying the <u>Shelton</u> factors to deny a motion to compel opposing counsel's deposition).[11]

In this case, Mr. Ramirez was to be deposed and was ordered to produce the following: "all documents or tangible things evidencing the advice sought and disclosures made to you by Respondent, CRAIG BAUMGARTNER, concerning his child support obligation during the years 2002, 2003, and 2004; including but not limited to, your appointment calendars, log books, evidence of research you conducted, or any records, reports, or forms he provided you in your possession and control."

To begin with, the subpoena to Mr. Ramirez was overbroad in its scope. Susan sought to disprove Craig's affirmative defense

---

[11]We note that the Seventh Circuit has not considered whether to adopt the rule set forth in <u>Shelton</u>. <u>Taylor Machine Works, Inc. v. Pioneer Distribution, Inc.</u>, No. 06-1126, slip order at ___ (C.D. Ill. June 19, 2006). However, the <u>Shelton</u> rule has been addressed in a number of District Courts within the Seventh Circuit, with mixed results. See <u>Taylor</u>, slip order at ___. Nonetheless, this court is not bound to follow decisions by federal courts other than the United States Supreme Court. <u>Behrens v. Harrah's Illinois Corp.</u>, 366 Ill. App. 3d 1154, 852 N.E.2d 553 (2006).

that he relied on Mr. Ramirez's calculations for 2002 and 2003. However, in his affirmative defense, Craig asserted that he did not hire an attorney to assist him with the 2004 calculations. In addition, the letters from Mr. Ramirez to Susan regarding the 2002 and 2003 child support figures contained the information he utilized in arriving at those figures.

Susan requested Ms. Campbell's deposition and document production based on the fact that Ms. Campbell's name appeared on the facsimile cover sheet from Craig's sole proprietorship. Ms. Campbell was required to produce the following: "all documents or tangible things evidencing your employment or association with Craig Baumgartner, d/b/a Baumgartner Consulting, during the years 2002, 2003, and 2004; including, but not limited to, federal tax forms 1040, W-2, and 1099, paycheck stubs, reimbursement check stubs, employment contracts, expense reports, appointment calendars, client lists, or literature in your possession or control."

If all Susan was seeking was to establish the role Ms. Campbell had in Craig's business, the subpoena and document request were similarly overbroad in their scope. Rather than depose Ms. Campbell, Susan could have taken Craig's deposition or submitted written interrogatories to Craig or Ms. Campbell to determine the extent of Ms. Campbell's involvement in his company. Moreover, there was no indication that Ms. Campbell's involvement in Craig's company had any bearing on the issue of child support in this case.

No. 1-06-2866

Applying the "Shelton Rule" to the facts in this case, Susan failed to prove that information she sought via the depositions of opposing counsel could not be obtained from other sources or was crucial to the case. Nonetheless, Susan maintains that sanctioning her was inappropriate because it punished her rather than accomplishing discovery, relying on Wegman v. Pratt, 219 Ill. App. 3d 883, 891-92, 579 N.E.2d 1035 (1991) ("An order of sanctions that is just within the meaning of Rule 219 is one that provides both for discovery and for trial on the merits").

In Wegman, the trial judge sanctioned the plaintiff for subpoenaing him (the trial judge) to testify by dismissing count I of the complaint. On review, the court discussed the type of sanctions that a court could impose under Rule 219(c) and noted that "[i]n determining which sanction to impose, the trial court must seek to accomplish discovery rather than to inflict punishment; because dismissal is a severe sanction, it should be invoked only in those cases where the actions of the party show a deliberate, contumacious, or unwarranted disregard of the court's authority. [Citation.] The entry of a dismissal under Rule 219(c) should be employed as a last resort in order to enforce the rules of discovery and should be set aside when a trial on the merits may be had without hardship or prejudice." Wegman, 219 Ill. App. 3d at 891.

Applying the above analysis to the case before it, the reviewing court recognized that using the legal process to

51

accomplish some improper ulterior purpose was "an abuse of process of the court" and that the discovery rules permitted sanctions to be imposed on parties who abused or disregarded discovery rules. The court concluded, however, that the subpoenaing of the trial judge was not intended to accomplish an improper ulterior motive, and therefore, dismissal of count I of the complaint was an inappropriate sanction. Nonetheless, the court recognized that the trial court had the authority in the appropriate case to dismiss an action as a sanction. Wegman, 219 Ill. App. 3d at 891.

Unlike the plaintiff in Wegman, Susan's conduct in subpoenaing Craig's attorneys was sanctionable. The subpoenas and document production requests were over broad in light of the reasons Susan posited for their issuance. Susan persisted in demanding the depositions even after her attorney was advised by opposing counsel that the depositions were an improper discovery tactic and warned that sanctions would be sought if he failed to rescind the subpoenas. Susan could have sought a ruling by the circuit court as to the propriety of issuing subpoenas to opposing counsel in this case but failed to do so. The court specifically found that subpoenaing Craig's attorneys was done with the purpose of seeking their disqualification or harassment. The court did not dismiss Susan's petition but imposed a lesser sanction of paying the attorney fees incurred for challenging the subpoenas. Such a sanction did not deprive Susan of a trial on the merits or of properly obtainable discovery and is specifically provided for in

No. 1-06-2866

Rule 219(c) when instances of misconduct have occurred.

Finally, Susan argues that the circuit court failed to comply with Rule 219(c) in that it did not specify its reasons and the basis of any sanction imposed in the judgment order or in a separate written order. As Craig notes, the court's written judgment order referenced the court's oral findings. Moreover, the basis for the imposition of the sanction was clear from the record. We find no basis to reverse on that ground. See Chabowski, 291 Ill. App. 3d at 528, (court's failure to set forth grounds for Rule 219(c) sanctions not per se reversible error).

We conclude that the circuit court did not abuse its discretion in imposing sanctions for Susan's conduct in subpoenaing Craig's attorneys.

For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

SOUTH and KARNEZIS, JJ., concur.

53