2016 IL App (1st) 143190
No. 1-14-3190
Opinion filed June 30, 2016

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| CARLOS MCGARY, | ) ) ) ) Appeal from the Circuit Court |
| Plaintiff-Appellant, | ) of Cook County. |
| v. | ) ) |
| ILLINOIS FARMERS INSURANCE, | ) No. 2011 L 5484 ) |
| Defendant-Appellee | ) The Honorable |
| (Caren Schulman and Solomon Morgan, Contemnors-Appellants). | ) Eileen O'Neill Burke, ) Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Simon concurred in the judgment and opinion.

**OPINION**

¶ 1    Carlos McGary sued Illinois Farmers Insurance (Farmers) for not paying an insurance claim after a car accident. During discovery, a witness, Solomon Morgan, refused to answer Farmers' deposition questions on the advice of his attorney. The trial court held Morgan and his attorney in contempt and ordered they pay sanctions to Farmers.

¶ 2        Morgan and his attorney, Caren Schulman ("the contemnors"), argue that they should not have been held in contempt because Farmers' deposition questions were irrelevant to the issue of whether McGary violated the policy's cooperation clause, and the "mend the hold" doctrine prevents Farmers from changing that already-stated position. We need not decide whether the contemnors may invoke the "mend the hold" doctrine, as we vacate the contempt and sanction orders and remand because the contempt order lacks a purge provision and both orders lack written reasons as required under Illinois Supreme Court Rule 219(c) (eff. Sept. 1, 1974).

¶ 3                                            BACKGROUND

¶ 4                                   The Accident and Investigation

¶ 5        On June 29, 2010, Carlos McGary went to a police station and made a report that while leaving a gas station in Lynwood, IL, he accidentally rear-ended a car, which then drove off. The report listed McGary as the driver living on South Forrestville Avenue in Chicago, and Farmers as the insurance company. Another man, Solomon Morgan of South Michigan Avenue in Chicago, was identified as the owner of the Bentley, which McGary was driving. McGary had added the Bentley to his existing Farmers policy on June 25, 2010. The certificate of insurance reflected his mother, Vernelle McGary, as the Bentley's owner.

¶ 6        A "used vehicle order" from A&S Auto Sales in Columbus, Ohio, dated June 21, 2010, indicated McGary purchased the Bentley for $55,000 by trading in a 2007 S550 Mercedes and paying $15,000 cash on delivery. Farmers' investigator David Sowinski interviewed McGary on August 10, 2010. McGary told Sowinski that he lived in Minnesota, and claimed to have purchased the Bentley on June 21, 2010, for $55,000, trading in a Mercedes S550 to reduce the price. The Mercedes had been titled to Solomon Morgan, who transferred the title to McGary so McGary could use it in trade. Morgan did this in exchange for $7500 and as a favor to McGary.

McGary said he was a registered sex offender in Illinois but it was permissible for him to live in Minnesota. At some point McGary refused to further answer Sowinski's questions on the grounds that McGary did not think the questions to be relevant to his insurance claim.

¶ 7        Farmers' claim file reflects that about a month later, on September 13, a Farmers representative contacted Solomon Morgan. According to Morgan, he did not know McGary or a firm by the name of A&S Auto Sales and had never owned or purchased a Bentley. Morgan denied giving McGary the Mercedes because he owed McGary a favor. Morgan said that in 2009, an acquaintance named "Mendell" asked him to put a Mercedes in his name. Morgan received the Mercedes and the title and garaged the car for a year before Mendell retrieved it. Morgan indicated he was "very concerned and angered that it appears he was taken advantage of."

¶ 8        On November 10, 2010, McGary participated in an "examination under oath" conducted by a Farmers attorney. McGary said he lived in Minnesota with his mother and had previously lived on Forrestville Avenue in Chicago. He admitted to two felony convictions in Cook County, one for kidnapping and the other for armed violence (which he sometimes referred to as a drug conviction). Although he had moved to Minnesota, McGary still carried an Illinois driver's license.

¶ 9        McGary said he purchased the Bentley at an Ohio car dealership, A&S Auto Sales, on June 21, 2010. That same day, he called Farmers to add the Bentley to his already existing insurance policy. The price of the Bentley was $55,000, and McGary traded in a S550 Mercedes as part of the purchase. The owner of the Mercedes was his friend Solomon Morgan, who had signed the title and put the car in McGary's name. Morgan did this because he owed McGary a favor. McGary obtained the Mercedes in 2007 and drove it until 2010, though the Mercedes

remained in Morgan's name, the registration stickers had expired, and there was no insurance on the Mercedes.

¶ 10    In addition to the trade-in, the receipt showed McGary paid $15,000 cash on delivery. McGary, though, said he paid A&S Auto Sales $5000 at the sale, then wired an additional $8000 to A&S Auto Sales later. He still owed money and had receipts for the payments at home. McGary had no other bills of sale. He initially tried to register the Bentley in Minnesota but, due to the high vehicle tax, he then tried and failed to register the car in Illinois, before finally applying to title it in Minnesota on August 5, 2010 (after the accident).

¶ 11    On the evening of the accident, McGary was turning left out of a gas station parking lot when he rear-ended another car, which immediately sped off, though it was badly damaged. Police did not come to the scene. The Bentley was damaged and leaking antifreeze, so McGary drove to his friend Keesha's house, and Keesha drove him to the police station to report the accident. He told the police that Morgan was the Bentley's owner, but he did not call Morgan to tell him about the accident. Instead, Morgan later called McGary because he had not known that McGary had traded in the Mercedes, and Morgan was not involved in purchasing the Bentley. McGary reported the accident to Farmers the day of the accident, and, a few days later, Farmers towed the Bentley.

¶ 12    At this point in the examination, Farmers' attorney asked McGary if he needed to take a break. McGary said he wanted to get food and take medication. The examination was recessed, and when it resumed, the attorney asked more questions about the Bentley and McGary's criminal history. McGary stated that he was a registered sex offender in Illinois and had told Illinois authorities that he was living in Chicago. McGary became agitated and protested these questions, stating that this "got nothing to with my insurance" and "I gave you enough

information anyway." Farmers' attorney then asked questions about paperwork, receipts, and license plates, but McGary cut off further questioning and left the room.

¶ 13     On December 22, 2010, Farmers informed McGary that it would not cover his accident due to his failure to "cooperate [ ] and assist [Farmers] in any matter concerning a claim or suit" and "submit to examination under oath upon request."

¶ 14                         This Lawsuit

¶ 15     In 2011, McGary filed a complaint against Farmers alleging breach of contract for failing to pay his claim. Farmers' answer to the complaint deny many of McGary's assertions but does not raise any affirmative defenses.

¶ 16     Farmers deposed McGary. He stated that he now (in May 2013) lived on South Forrestville Avenue in Chicago, having moved there from Minnesota in January 2011. He bought the Bentley in Ohio on June 21, 2010, in exchange for a Mercedes and $15,000 (paid in $5000 installments). He did not have any receipts indicating that he paid the first $5000 installment. McGary refused to answer whether the Mercedes had a license plate at the time of the trade-in or whether Morgan was with him when he bought the Bentley, or the names of those who did accompany him. McGary tried to register the car in Minnesota on August 5, 2010, but there had been a delay in registering it due to the paperwork. He never tried to title the Bentley in Illinois.

¶ 17     The Mercedes belonged to Solomon Morgan, who signed over title to the Mercedes to McGary as a favor in January 2010. When confronted with documents showing that A&S Auto Sales had title to the Mercedes on March 16, 2010 (well before McGary supposedly traded it as part of the June 21 sale), McGary said, "maybe he backdated some stuff."

¶ 18    McGary described the accident as happening on June 29 in Lynwood, where he rear-ended another car and the driver sped off. McGary drove to the nearby police station and the police filled out a crash report. The police ran the VIN number on the Bentley, and it was still registered to Morgan, so McGary provided Morgan's name and address for the crash report. The police did not look at the Bentley before filling out the report. McGary testified that the narrative section of the report was wrong and he had not been at a gas station before the accident, and had not driven to Keesha's house afterwards. (And, he denied knowing anyone named Keesha.) After leaving the police station, McGary drove to his friend Emanuel's house, and the Bentley stayed there until Farmers sent a tow truck for it.

¶ 19    The owner of A&S Auto Sales, Ahmad Mohamad Salah, was deposed. Salah met McGary when he came to A&S Auto Sales to buy a Bentley. (Salah had sold few Bentleys, so he remembered McGary.) McGary came to A&S Auto Sales with three others, seeking to trade in a 2007 S550 Mercedes and pay cash for the Bentley. Salah identified a bill of sale dated June 21, 2010. Salah then revealed that he had issued *two* bills of sale for this purchase, at the request of someone (Salah could not recall from whom). This person stated that a second bill of sale was needed to get proper title to the Bentley. The June 21 bill was the second bill. After examining title paperwork for the Mercedes and the Bentley, Salah eventually concluded that he had actually sold the Bentley to Morgan in January or February 2010, and McGary had obtained the second bill of sale in June 2010.

¶ 20    Tameka Sampson spoke to Farmers' investigator on October 15, 2014, in a recorded conversation. Sampson said she obtained the Bentley from Morgan on May 3, 2010, in exchange for some foreclosed property. The Bentley was in fine condition on May 3, but McGary damaged it in an accident before June 19, 2010. Sampson knew this because her birthday was June 19; her

ex-boyfriend had arranged to take her out for her birthday in the Bentley, but could not because of the damage. Sampson was not present during the accident, but McGary told her he had hit something in Harvey. McGary did not file the accident report right away and he and Sampson's ex-boyfriend argued over who was going to pay for the damages as there was no insurance on the Bentley at the time of the accident.

¶ 21 Title search results for the Mercedes showed that Morgan purchased the Mercedes on February 28, 2009, and A&S Auto Sales had title on March 16, 2010. McGary was not listed as the Mercedes' owner. A title certificate for the Bentley indicated Tameka Sampson purchased the Bentley on May 3, 2010.

¶ 22 Solomon Morgan and the Contempt Proceedings

¶ 23 Morgan was deposed July 10, 2014. He testified that he lives in Chicago, works in car repair, and buys and sells cars on the side. He had known McGary all his life, but did not know where McGary lived. He refused to answer questions about whether he owed McGary a favor.

¶ 24 Morgan was familiar with A&S Auto Sales from searching for cars on the Internet, but had never had dealings with A&S Auto Sales or spoken with anyone there. He was not familiar with the Bentley. He had never had title to it or been questioned by police about the accident. He was not in the Bentley during the accident and had never seen the accident report, but his home address was listed correctly on the report. He did not know why he was identified as the Bentley's owner. Morgan testified that he had paperwork for the Mercedes, but the papers had been ruined during a fire at his business.

¶ 25 His counsel, Caren Schulman, objected to questions about his car sales and purchases as being irrelevant to McGary's cooperation with the examination and instructed Morgan not to answer these questions. She also instructed him not to answer whether he ever owned or acquired

the Mercedes, had title to it, gave it to McGary, or knew that the Mercedes had been traded in for the Bentley; questions about his earlier statement to the Farmers' investigator about his friend "Mendell" asking Morgan to put the Mercedes in his own name; who was paying for Schulman's legal services; whether he had ever discussed the accident with McGary; whether McGary had told him that McGary had listed Morgan on the accident report; or whether he had been approached by anyone asking him to give the Mercedes to McGary. Farmers' counsel certified these questions during the deposition.

¶ 26　　The next day, Farmers moved to compel Morgan to answer the questions. Morgan argued that the "mend the hold" doctrine, which (if applicable) would limit Farmers' defenses to the complaint, rendered the unanswered questions irrelevant; he asked that the trial court make a "summary determination" that the "mend the hold" doctrine applied. Morgan also asked the court to hold Schulman in contempt so that she could immediately appeal the issue.

¶ 27　　The record does not contain a transcript of the hearing on the motion. On August 11, 2014, the trial court granted Farmers' motion to compel, and ordered that Morgan be deposed within 30 days. The written order did not reference Schulman's request to be held in contempt or specify which questions Morgan was compelled to answer at the resumed deposition. On the same date, the trial court denied McGary's motion for "summary determination of a major issue" (the "mend the hold" doctrine's applicability), without prejudice.

¶ 28　　Morgan again sat for a deposition on October 1, 2014. Schulman again objected to the questions that were "not part of the subject matter." Farmers' counsel noted that the trial court had already overruled the objections, but Schulman responded, "well, the Court can hold me in contempt" and directed Morgan not to answer the questions. Schulman admitted to not telling Farmers' counsel in advance that she would again be directing Morgan not to answer questions.

¶ 29  The next day, Farmers petitioned for a rule to show cause against Morgan and Schulman for their actions during the resumed deposition, asking that they be held in contempt and pay sanctions. The record does not contain a transcript of the court's ruling on the petition. The court issued a written order on October 6, 2014, granting the petition and holding Schulman and Morgan in contempt "for the reasons set out" in Farmers' petition. The court assessed a fine of $100 per day, and further ordered as a sanction against Morgan and Schulman the cost of the resumed but fruitless deposition in an amount based on submissions from Farmers.

¶ 30  On October 14, 2014, Farmers moved to enforce the contempt order, stating that Schulman had not yet filed a notice of appeal or moved to stay the order. Farmers also moved for sanctions in the amount of $1802.54 as the cost of the resumed but fruitless deposition. On October 17, 2014, Morgan, Schulman, and McGary filed a notice of appeal.

¶ 31  Schulman and Morgan also responded to the motion to enforce the contempt order. In an affidavit, Schulman stated that the contempt order was supposed to be "friendly" contempt and that Farmers' counsel had improperly drafted the order.

¶ 32  On October 21, 2014, the trial court continued the motion to enforce the contempt order, but granted the sanctions of $1802.54, to be paid within 10 days. The court also granted Morgan and Schulman leave to file a motion for a stay of the contempt order. There is no transcript of the hearing and the record does not contain a copy of the motion to enforce the contempt order. Morgan and Schulman filed an amended notice of appeal on November 5, 2014, citing orders entered August 11, 2014; October 6, 2014; October 21, 2014; and orders "leading to the orders of" October 6 and October 21.

¶ 33         STANDARD OF REVIEW

¶ 34     There has been no final judgment, but we have jurisdiction over this appeal under Illinois Supreme Court Rule 304(b)(5) (eff. Jan. 1, 1970), which allows an appeal of an "order finding a person or entity in contempt of court which imposes a monetary or other penalty." When a party appeals a contempt sanction imposed for violating a pretrial discovery order, the discovery order itself is subject to review. *Norskog v. Pfiel*, 197 Ill. 2d 60, 69 (2001).

¶ 35     The parties disagree whether we should review the order for an abuse of discretion (as is typical for discovery issues) or *de novo* (for the legal applicability of the "mend the hold" doctrine to the discovery dispute). See *Doe v. Township High School District 211*, 2015 IL App (1st) 140857, ¶¶ 74-76 (" 'the proper standard of review depends on the question that was answered in the trial court' " (quoting *Norskog*, 197 Ill. 2d at 70)). But because we vacate the contempt and sanction orders for failing to abide by the requirements of Illinois Supreme Court Rule 219(c) (eff. Sept. 1, 1974), we need not determine if the contemnors can offensively invoke the equitable doctrine of "mend the hold" during discovery to prevent Farmers from asserting new defenses, or which standard of review applies.

¶ 36                                   ANALYSIS

¶ 37                       Contempt and Sanction Order

¶ 38     The trial court held several hearings on the discovery issue, the contempt finding, and the sanctions (on August 11, October 6, and October 21, 2014). At oral argument, counsel revealed that there was no court reporter present for these hearings. Without transcripts, we do not know what occurred and must assume the regularity of the proceedings. "The law is well settled that appellants bear the duty to present a record *** which fairly and fully presents all matters necessary and material for a decision of the question raised." (Internal quotation marks omitted.) *Emery v. Northeast Illinois Regional Transportation Co.*, 374 Ill. App. 3d 974, 979 (2007).

¶ 39     For example, the contemnors argue that the trial court violated their due process rights by failing to give them notice and an opportunity to be heard before holding them in contempt and imposing sanctions. We have no idea. The contemnors characterize the contempt order as "friendly" contempt (where an attorney asks the trial court to hold them in contempt as a formality, so the underlying order can be tested on appeal). Again, we do not know if the trial court issued the contempt order to allow Schulman to appeal the underlying discovery issue, or to force Schulman into compliance with its earlier order.

¶ 40     Also, at oral argument Morgan's counsel argued that the August 11 order merely required him to appear at a deposition, not to answer certain questions. But since this order was entered in response to Farmers' motion to compel Morgan to answer these questions, we will assume that during the hearing on this motion, the trial court indeed ordered Morgan to answer, not simply to appear. On all these factual disputes surrounding the contempt order, we must hold that the trial court did not err.

¶ 41     The contemnors further argue that the trial court's October 6 order holding them in contempt (to the tune of $100 per day) is "void *ab initio*" because it failed to contain a "purge provision," lifting the sanction when the contemnor complies with the court's instructions. *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007) (indirect civil contempt order must contain purge provision).

¶ 42     The trial court did err due to the absence of a purge provision, but the October 6 order is not void. The term "void *ab initio*" is typically used in holding a statute unconstitutional in its entirety. See, *e.g.*, *People v. Blair*, 2013 IL 114122, ¶ 28 (unconstitutional act is "as inoperative as though it had never been passed" (internal quotation marks omitted)). When a trial court issues an order that does not comply with statutes, court rules, or common law, our supreme

court distinguishes between "void" and "voidable" judgments. Where the trial court lacks jurisdiction, the judgment is "void." *People v. Davis*, 156 Ill. 2d 149, 155 (1993). A "voidable" judgment is one entered erroneously by a court with jurisdiction. *Id.* at 156.

¶ 43       The trial court should have included a purge provision (as simple as "$100 per day until Solomon Morgan resumes and completes his deposition, including the questions certified"). But its absence does not render the entire order "void *ab initio*" or even "void." The trial court had proper jurisdiction–over the parties and the subject matter–to enter the order. We will follow our earlier decision in *Bank of America, N.A. v. Freed*, 2012 IL App (1st) 113178. In that case, a trial court entered an invalid purge provision and we remanded so it could amend the provision. *Id.* ¶ 44. The contemnors argue that this case differs because the trial court entered no purge provision at all, but we do not think that this distinction renders the trial court's actions "void." The trial court erred, but it had jurisdiction; the error can be corrected.

¶ 44       Similarly, the trial court erred in not including written reasons in the order for its contempt citation. Under Illinois Supreme Court Rule 219(c) (eff. Sept. 1, 1974), when a party disobeys a discovery order, the trial court may compel obedience with contempt proceedings. But the trial court must "set forth with specificity the reasons and basis of any sanction so imposed either in the judgment order itself or in a separate written order." Ill. S. Ct. R. 137(c) (eff. Sept. 1, 1974). The October 6 order did not contain the trial court's reasons and basis for the contempt finding, nor was there a separate written order. For this reason, we vacate the order and remand to the trial court. (The August 11 order, which required Morgan to be deposed but did not list the specific questions he must answer, does not fall within the Rule 219 purview, and thus that order did not require the specificity of a contempt order.)

¶ 45    The same analysis applies to the October 21 order imposing sanctions of $1802.54. Again, the trial court did not include reasons in its written order for why it was imposing sanctions, in violation of Rule 219(c). We vacate the order and remand to the trial court.

¶ 46    Other courts have relaxed the Rule 219(c) requirement, holding that, when a trial court's contempt or sanction order was entered in accord with a written motion, or where the reason for the contempt can be surmised from the record, an appellate court can affirm a trial court order that does not set forth its specific reasons in writing. See, *e.g.*, *Illinois Emcasco Insurance Co. v. Nationwide Mutual Insurance Co.*, 393 Ill. App. 3d 782, 790 (2009); *In re Marriage of Baumgartner*, 384 Ill. App. 3d 39, 68 (2008); *Glover v. Barbosa*, 344 Ill. App. 3d 58, 63 (2003). We disagree with those decisions. These appellate rulings not only dampen the application of Rule 219(c), but rewrite it in a way that reduces transparency and judicial accountability for decisions.

¶ 47    We interpret supreme court rules the same way we interpret statutes, and give their language the plain and ordinary meaning. *People v. Marker*, 233 Ill. 2d 158, 166 (2009). The rules should not be interpreted in a way that renders their terms meaningless or superfluous. *People v. Jones*, 168 Ill. 2d 367, 375 (1995). Further, specific requirements in supreme court rules cannot be selectively ignored. See *People v. Houston*, 226 Ill. 2d 135, 152 (2007) ("This court has often noted that our rules are not mere suggestions. Rather, they have the force of law, and the presumption must be that they will be obeyed and enforced as written." (Internal quotation marks omitted.)).

¶ 48    Failure to provide these written reasons for the contempt and sanction orders clashes with plain language of Rule 219(c) and has consequences for our ability to decide the issues. The purpose of Rule 219(c) is to inform the parties of the reasoning for the trial court's decision and

to make a record for appellate court review; in this case, the parties might know what the trial court was thinking but we do not. Also, written reasons promote respect and trust in the efficacy of an order of contempt or an order of sanctions, both serious remedial tools.

¶ 49        Finally, the contemnors argue that the trial court had no jurisdiction to enter the October 21 order awarding Farmers sanctions of $1802.54 because the contemnors' October 17 notice of appeal took jurisdiction from the trial court. The contemnors are wrong. The October 6 order, which granted the contempt finding and sanctions in an amount to be determined, was not an appealable order because the trial court had not yet imposed a monetary penalty for the sanctions (and stated that it would impose a penalty following Farmers' submissions). See Ill. S. Ct. R. 304(b)(5) (eff. Jan. 1, 1970) (allowing appeal from judgment of order finding person in contempt "which imposes a monetary or other penalty"). Thus, the October 17 notice of appeal was premature and did not divest the trial court of jurisdiction. The contemnors invite us to divide the October 6 order into its component parts, holding the contempt separate from the sanctions. But these two penalties stem from the same factual circumstances: Morgan's refusal to answer questions at his renewed deposition. The trial court had jurisdiction to enter the October 21 order, and only the November 5 notice of appeal was valid.

¶ 50        We vacate the October 6 and October 21 contempt and sanction orders and remand to the trial court.

¶ 51         Orders vacated and cause remanded.